NIESEN, Respondent, v. NIESEN, Appellant.

*February 29—April 9, 1968.*

For the appellant there was a brief of *Harvey, Weber & Gerard* and *Richard G. Harvey, Jr.,* attorneys, and *Adrian P. Schoone* of counsel, all of Racine, and oral argument by *Mr. Schoone* and *Mr. Richard G. Harvey, Jr.*

For the respondent there was a brief by *Stewart & Peyton* and *John Peyton,* all of Racine, and oral argument by *John Peyton.*

HALLOWS, C. J.   The facts on the hearing were stipulated and it is claimed by the defendant the two boys by changing their surnames emancipated themselves and thus he was no longer obligated to support them. The issue might well be stated, whether minors of the age of approximately twenty and eighteen years who legally forsake their father's name and embrace the surname

of their mother's second husband are entitled to the continued support of their father.

A father's duty to support his child rests upon not only moral law but legally upon the voluntary status of parenthood which the father assumed. The relationship of parent and child gives rise to certain parental rights and duties and also to rights and duties of the child. The partial or total destruction of these rights is often referred to in the law as emancipation, which in most states automatically occurs by operation of law upon the child's reaching the age of majority excepting in cases of infirmity of mind or body rendering the child incapable of taking care of himself. The act emancipating a child prior to age twenty-one is generally the act of the parent and such emancipation is concerned more with the extinguishment of parental rights and duties than with the removal of the disabilities of childhood.

While it is often said emancipation cannot be accomplished by an act of the child alone, this is not always true. Marriage and entering into military service have been held to be acts of self-emancipation. In 39 Am. Jur., *Parent and Child,* p. 704, sec. 64, it is stated as a general rule that the fact that a child has entered into a relation which is inconsistent with the idea of being in legal subjection to his father or in a sense in bondage is sufficient to effect an emancipation. Emancipation may be partial or total and limited to certain purposes. It may prevent the parent from having a right to the earnings of his child and conversely, it may free parents under some circumstances from being responsible for the debts of the child because of the removal of the general disabilities of infancy. 67 C. J. S., *Parent and Child,* p. 815, sec. 89; Annot. (1946), *What amounts to implied emancipation of minor child,* 165 A. L. R. 723. However, total or partial emancipation is personal to the parties and does not shift the responsibility to support from the father to the public.

There is no hard-and-fast rule to determine emancipation—much depends upon the circumstances and the intent of him who has the power to effect an emancipation. The facts in the record are scanty. Peter graduated from high school in June of 1964 and then attended the University of New Mexico. His tuition of almost $900 was paid by his mother and her second husband. Michael Wilson attended an eastern college for the school years of 1963 and 1964. He worked during the summers of 1963 and 1964 in Milwaukee where he earned about $2,000. During the summer of 1963 he lived at the YMCA, the cost of which he paid himself. During the summer of 1964 he lived at the home of his aunt in Milwaukee, where his father also lived. Tuition of approximately $3,000 for college was paid by his mother and stepfather. During these two years the defendant gave his son Peter goods in the sum of $250 and a 1959 automobile worth about $650. There is nothing in the stipulation which shows the plaintiff-mother encouraged Peter and Michael to change their surname, and no reason given for their action.

In the present case, we must consider emancipation not in the context of a normal, modern family but against a background of a divorce and a broken home and of a father who no longer has legal custody of his minor children who are university students. While granting legal custody in a divorce action to the mother does not technically emancipate the children from the father, it certainly affects the concept of emancipation. In such instances the emancipation doctrine does have a very substantial footing on relations existing between the child and his father. Here, the father had no legal control or custody of his sons and no right to their earnings. Such rights of control were transferred by the divorce decree to their mother and there is no claim of emancipation from her.

Considering the concept of emancipation as applicable to this issue, the majority of the court does not find an

emancipation. Cases cited by the defendant are not controlling. In *Brosius v. Barker* (1911), 154 Mo. App. 657, 136 S. W. 18, the facts to support emancipation did not involve a change of surname by the child but included the leaving of home and the commencement of life completely independent from the parents. In *Straver v. Straver* (1948), 26 N. J. Misc. 218, 59 Atl. 2d 39, a divorced father sought to have his eighteen-year-old girl declared emancipated by showing she had relinquished his surname and used that of her stepfather. She had also become estranged from him and was not obedient to him. However, the court pointed out in holding there was no emancipation that the eighteen-year-old daughter was only two years old at the time of the divorce and had used her stepfather's surname for over fourteen years with her father's acquiescence. In *von Bernuth v. von Bernuth* (1909), 76 N. J. Eq. 200, 74 Atl. 252, the case turned on a refusal of the children to see their father and their unnatural hatred fostered by their mother; the reduction of support money seems to be based more on the ground of a penalty visited upon the mother than upon any doctrine of emancipation. *See also Smith v. Smith* (1964), 85 N. J. Super. 462, 205 Atl. 2d 83; *Cortina v. Cortina* (Fla. 1958), 108 So. 2d 63; Annot. (1964), *Violation of custody or visitation provision of agreement or decree as affecting child support payment provision, and vice versa*, 95 A. L. R. 2d 118.

While there are general statements in the cases that the right to support by a father who has been divorced from the mother ceases upon the child's emancipation, none of the cases are square holdings that the change of surname, even if to the stepfather's surname, is such an act of emancipation. *Codorniz v. Codorniz* (1950), 34 Cal. 2d 811, 215 Pac. 2d 32; 27B C. J. S., *Divorce*, p. 724, sec. 323. *See also Green v. Green* (Mo. 1950), 234 S. W. 2d 350; 2A Nelson, *Divorce and Annulment*, p. 73, sec. 17.14; Keezer, *Marriage and Divorce* (1959 Cum. Supp.), p. 103, sec. 731.

In Wisconsin, a person fourteen years of age or older may change his own surname on his own behalf. Sec. 296.36, Stats. The New Mexico statute, sec. 22–5–1, contains the same age provisions. There are cases, especially of a young child in school and living with his mother, who has remarried, when the use of the stepfather's surname by the child avoids not only difficulties but embarrassment to the child who is unable to explain to his playmates that he is a tragic victim of divorce. Even though the social evil of divorce is widespread, children and many adults still do not accept as convenient or natural a different surname for a child and his mother. A change of surname under such circumstances could hardly constitute emancipation or be a basis for relieving the father of his duty of support. It would seem the test in surname changing, as in many other problems involving children of divorced parents, is the welfare of the child. *See Solomon v. Solomon* (1955), 5 Ill. App. 2d 297, 125 N. E. 2d 675, and *Bruguier v. Bruguier* (1951), 12 N. J. Super. 350, 79 Atl. 2d 497.

While the majority would apply Shakespeare to the facts: "What's in a name? That which we call a rose by any other name would smell as sweet," the minority of which the author is one would hold the sweetness of the flower has disappeared. We can well understand the defendant's feeling of rejection and repudiation by his own flesh and blood. While the father's reaction is not the test of emancipation or a basis in equity to relieve him of his obligation, we see no justification or excuse for what amounts to a repudiation of the parental relationship. The surreptitious action and the choice of the stepfather's surname in place of the surname of their natural father by these boys of college age smacks of ingratitude and parental rejection. What tenuous relationship was left after the divorce upon which to rest emancipation, these mature minors destroyed and by the only overt act left for them emancipated themselves. If the minority were to apply equitable principles, it would

find no basis upon which they could continue to claim the support of their rejected father. Each is of the age and mind to be self-supporting and to live his own life and to choose his own surname and identification.

As a second line of defense, the defendant claims his wife's second husband stands *in loco parentis* to his two children and therefore the defendant is free from the support obligation. A stepfather is under no obligation to support the child of his wife by a former husband so as to relieve him from support. In some cases where the stepfather takes the child into his family or under his care in such a way that he in fact intends and does place himself in the position of the father and is so accepted by the child, he may thereby assume an obligation to support such child. 39 Am. Jur., *Parent and Child,* pp. 699, 700, sec. 62. But a good Samaritan should not be saddled with the legal obligations of another and we think the law should not with alacrity conclude that a stepparent assumes parental relationships to a child. *Estate of Turer* (1965), 27 Wis. 2d 196, 133 N. W. 2d 765; *McManus v. Hinney* (1966), 31 Wis. 2d 333, 143 N. W. 2d 1; (1967), 35 Wis. 2d 433, 151 N. W. 2d 44; 67 C. J. S., *Parent and Child,* p. 808, sec. 80.

In the present case at the time of their mother's second marriage Peter was almost seventeen years of age and Michael was eighteen. They spent most of their time away from their new home at school. Outside of some evidence that the stepfather paid for some college expenses of the boys, which might have been motivated more by his love for their mother than for them, there is not much evidence that either of these boys considered their stepfather *in loco parentis* or that he so considered himself. Taking his surname is not sufficient evidence to establish the relationship of *loco parentis.*

*By the Court.*—Order affirmed.